Cite as 2024 Ark. App. 243

# ARKANSAS COURT OF APPEALS
DIVISION I
No. CR-23-539

| | |
|---|---|
| D'JUAN WILLIAMS<br><br>APPELLANT<br><br>V.<br><br>STATE OF ARKANSAS<br>APPELLEE | Opinion Delivered April 10, 2024<br><br>APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, SEVENTH DIVISION<br>[NO. 60CR-18-4295]<br><br>HONORABLE KAREN D. WHATLEY, JUDGE<br><br>AFFIRMED |

## WENDY SCHOLTENS WOOD, Judge

D'Juan Williams appeals the sentencing order entered by the Pulaski County Circuit Court convicting him of the first-degree battery of his six-month-old daughter (MC) and sentencing him to seven years' imprisonment. Williams's sole point on appeal is a challenge to the sufficiency of the evidence supporting his conviction. We affirm.

Williams testified that he and his wife separated on September 13, 2018, and that he had maintained custody of his three young children since that time.[1] He testified that he took the children to Michigan from September 18 to 26 to visit his family and that neighbors visited him during the last week in September, but he said he had been his children's sole caretaker during this time. He told detectives who interviewed him that although other

---

[1]MC was born on March 26, 2018; her two brothers were born on January 1, 2017, and February 8, 2016.

adults had been around his children, no one other than Williams had been alone with them. Williams said that on the morning of September 25, while he and the children were still in Michigan, he took MC to get her immunizations.

On September 30, Williams noticed that MC's arm was swollen and that she was "irritated" when he attempted to position her to drink a bottle. He thought perhaps the swelling was due to the shots MC had gotten in Michigan. The next day, after his attempts at soothing MC with ice packs and hot towels were unsuccessful and he heard "crunching" when he moved MC's arm, he took her to Baptist Health Medical Center. She was later transferred to Arkansas Children's Hospital (ACH).

Doctors at ACH performed a skeletal survey of MC—"head to toe" x-rays—and discovered that she had between twelve and fifteen fractures throughout her body. All of the fractures, except one rib fracture, were acute and showed no signs of healing. These included multiple fractures in both legs, two fractures in her left arm,[2] and seven rib fractures. She also had a black eye and some skin abrasions. Williams testified that MC had not had any falls or accidents, that she was not crawling yet, and that he did not know how she incurred the injuries.

Dr. Rachel Clingenpeel, an expert in child-abuse pediatrics and the associate director of the Team for Children at Risk at ACH, testified that she had been called in as a consultant for MC because MC had been admitted with unexplained fractures. She described the

---

[2]The fracture in MC's left humerus, the bone between her shoulder and elbow, required surgery.

2

injuries in the skeletal survey and explained that they were caused by "blunt force trauma" to the part of the body where they existed. She said that MC would have experienced immediate pain from the arm fractures and would likely have stopped using her arm. Dr. Clingenpeel also opined that the rib fractures were "extremely unusual and highly associated with abuse" because infant ribs are flexible, resistant to fracture, and not easy to break. She opined that MC was subjected to "multiple, violent traumas to different anatomical areas on at least two occasions" and that the acute injuries likely occurred less than fourteen days before her admission. Finally, Dr. Clingenpeel testified that MC's various and numerous fractures could not have been caused during any sort of normal interaction with MC or by other small children. Dr. Clingenpeel also testified that someone would have been aware of the injuries because they were caused by "overwhelming trauma" to MC to which she would have responded in pain.

The jury convicted Williams of first-degree battery and sentenced him to seven years in prison. He has filed this appeal challenging the sufficiency of the evidence supporting his conviction.

When reviewing a challenge to the sufficiency of the evidence, we must assess the evidence in the light most favorable to the State and consider only the evidence that supports the verdict. *Collins v. State*, 2021 Ark. 35, at 4, 617 S.W.3d 701, 704. We affirm a conviction if substantial evidence exists to support it. *Price v. State*, 2019 Ark. 323, at 4, 588 S.W.3d 1, 4. Substantial evidence is evidence of sufficient force and character that it will, with reasonable certainty, compel a conclusion without resorting to speculation or conjecture. *Id.*,

3

588 S.W.3d at 4. Witness credibility is an issue for the fact-finder, which may believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *McKisick v. State*, 2022 Ark. App. 426, at 4, 653 S.W.3d 839, 843.

A person commits the offense of first-degree battery if he or she "knowingly, without legal justification, causes serious physical injury to a person he or she knows to be . . . twelve (12) years of age or younger[.]" Ark. Code Ann. § 5-13-201(a)(7) (Repl. 2013). A person acts knowingly with respect to the person's conduct "when he or she is aware that his or her conduct is of that nature" or when he or she is "aware that it is practically certain that his or her conduct will cause the result[.]" Ark. Code Ann. § 5-2-202(2) (Repl. 2013).

Williams first argues that the State failed to offer substantial evidence that *he* caused the injuries to MC because he denied knowing anything about the injuries, no one witnessed him injuring MC, and there were other individuals who could have caused the injury. He claims that investigators failed to contact his neighbors, friends, or family who had been in contact with him and the children during the two-week period before MC's admission to the hospital. Williams cites *Snow v. State*, 2018 Ark. App. 612, at 5, 568 S.W.3d 290, 293, in which a first-degree-battery conviction was reversed when there was no direct evidence of guilt, multiple adults had access to the child, neither adult who had access to the child was accused by the other, and the appellant offered no improbable explanations regarding the injuries.

We do not find *Snow* persuasive. This court reversed *Snow* in part because both parents had exclusive access to the child. Here, MC's mother had not seen MC in weeks,

and Williams testified that MC was not left in the care of any other adult than him during the period in which the injuries occurred. Moreover, if the injuries occurred in Michigan by some other party, the jury could have concluded that they would have been discovered when MC received shots on the morning they left Michigan. Finally, Dr. Clingenpeel testified that the injuries were caused by "multiple, violent traumas," that MC would have experienced immediate pain from the arm fractures and would likely have stopped using her arm, and that the rib fractures were "extremely unusual and highly associated with abuse" because infant ribs are not easy to break.

In light of this evidence, the jury could have determined that Williams would certainly have noticed MC's injuries, which is contradicted by his own testimony that he did not notice any of the injuries until late September and did not know the cause of the injuries. Particularly in light of Dr. Clingenpeel's testimony that MC would have experienced immediate pain and likely would have stopped using her arm, this also may have impacted the jury's determination regarding Williams's credibility. Therefore, we hold that there is substantial evidence to support the conclusion that Williams caused MC's injuries because, according to Williams, MC was never alone with anyone besides him during the relevant time period.

Williams also argues that the State failed to present substantial evidence that he "knowingly" caused MC's injuries because he testified that he had not noticed anything unusual with MC until September 30 when he discovered her swollen arm; he immediately attempted to treat her arm, thinking it was a reaction to the shots MC received while in

Michigan; he took her to the hospital when these treatments failed to relieve her; and he never wavered in his testimony that he did not know how MC had been injured. A person acts knowingly "when he or she is aware that his or her conduct is of that nature" or when he or she is "aware that it is practically certain that his or her conduct will cause the result[.]" Ark. Code Ann. § 5-2-202(2). A defendant's state of mind is rarely capable of proof by direct evidence and must be inferred from the circumstances of the crime. *Suchey v. State*, 2016 Ark. App. 225, at 7, 490 S.W.3d 320, 324. The jury could have reasonably inferred that Williams acted knowingly from his own testimony—that MC was never alone with anyone besides him, that Williams was MC's sole custodian and caretaker during the relevant time, and that he never noticed anything unusual about MC until September 30—coupled with Dr. Clingenpeel's testimony about the violent nature of the injuries and the manner in which they could have occurred. We hold this constitutes substantial evidence that Williams acted knowingly.

Affirmed.

VIRDEN and KLAPPENBACH, JJ., agree.

*David Sudduth*, Public Defender, by: *Clint Miller*, Deputy Public Defender; and *David R. Raupp*, Arkansas Public Defender Commission, for appellant.

*Tim Griffin*, Att'y Gen., by: A. *Evangeline Bacon*, Ass't Att'y Gen., for appellee.